*784 OPINION OF THE COURT
Rosalie S. Bailey, J.
This proceeding seeks to vacate an acknowledgment of paternity signed by petitioner, Martin D., on November 1, 1997. It is uncontested that prior to filing this petition, Mr. D. surreptitiously obtained a private genetic marker test during his visitation with the child. This was performed by an unlicensed laboratory and purported to exclude him as the father.
According to section 516-a of the Family Court Act, a petition to vacate a voluntary acknowledgment of paternity must be brought within 60 days of either its signing or of a judicial proceeding regarding the child. That deadline has long passed. As that section further provides, “[a]fter the expiration of sixty days of the execution of the acknowledgment, either signator may challenge the acknowledgment of paternity in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof on the party challenging the voluntary acknowledgment.” (Family Ct Act § 516-a [b].)
The trial in this matter, therefore, concerned the issues of whether or not the acknowledgment was based upon “fraud, duress, or material mistake of fact” and whether or not Mr. D. should be equitably estopped from denying paternity. The testimony showed that Mr. D. had established a very significant relationship with the subject child, but that in September 2003, when the child was nearly six years old, he obtained a private genetic marker test that purported to rule out the possibility of his being the child’s biological father. At that point, he cut off all contact with the child. This petition was filed 10 months later, in July 2004.
Mr. D. argues that he signed the acknowledgment based upon mistake of fact caused by Ms. F.’s statements to him that he was the father and that, therefore, the acknowledgment should be vacated. He also argues that it is in the child’s best interests to vacate the acknowledgment “to prevent even the possibility of a future parental relationship that could be harmful to the infant in this case.” This alleged harm would be the reintroduction of Mr. D. into the child’s life after he himself apparently traumatized her by summarily cutting off his prior relationship with her. The Law Guardian joined in the argument that future contact between the child and Mr. D. would be harmful to the child because of the possibility that he might again cut off contact with her as he did after receiving the paternity test results.
*785 There is a significant history of litigation between the time the acknowledgment was signed and the current proceeding. It appears that the earliest proceeding concerning this child was one for child support, which was resolved on May 26, 1998, when Mr. D. voluntarily consented to pay child support. Since that time, Mr. D. has filed four petitions regarding child support and has been the respondent in two other child support petitions. In each of these proceedings, the question of whether or not Mr. D. was, in fact, the father of this child was necessarily at issue, even if it was not expressly addressed. (See, e.g., Matter of Melissa S. v Frederick T., 8 AD3d 738 [3d Dept 2004].) As the Court explained in Jeanne M. v Richard G. (96 AD2d 549, 550 [2d Dept 1983]), “[b]efore an order of support could be made, the court necessarily made a determination of paternity, as only a ‘parent’ may be ordered to support his or her child.”
In addition to the child support proceedings, Mr. D. has filed six custody or visitation petitions and been the respondent in seven. As recently as May 15, 2003, Mr. D. entered into a stipulation granting him joint custody of the child, after having petitioned for sole custody.
The extensive course of litigation regarding this child raises the question of whether or not Mr. D. should be collaterally estopped from litigating paternity. The nature of collateral estoppel is discussed in Matter of Sandra I. v Harold I. (54 AD2d 1040 [3d Dept 1976]). “It is a fundamental principle of jurisprudence that material facts or questions which were in issue in a former action, and were there admitted or judicially determined, are conclusively settled by a judgment rendered therein, and may not again be litigated in a subsequent action.” (Id. at 1041.) The Court went on to explain that, in order for collateral estoppel to apply, “[t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.” (Id.)
As demonstrated in Melissa S. v Frederick T. (supra), when a court orders a party to pay child support, there is necessarily a finding of parenthood, even if not expressly made. On May 26, 1998, the parties stipulated to child support payments by Mr. D. The stipulation recited that
“[w]e further acknowledge that all issues in this proceeding were disposed of by an Agreement placed on the record in open Court. The undersigned each *786 hereby acknowledge that the terms of the agreement were fully explained and are fully understood and that the Agreement is freely and voluntarily made without force, fraud or duress and with the opportunity to seek the advice of counsel.”
One of the issues so disposed of was, necessarily, paternity. In January 1999, Mr. D. filed a petition seeking to modify his support obligation, then failed to appear in court, resulting in dismissal. In June 1999, he was the respondent in a proceeding for support and again failed to appear, resulting in a default judgment. That same month he failed to appear in court on another petition he had filed seeking modification. The same thing occurred in October 1999. Another support petition, in which Mr. D. was the respondent, was resolved by consent in September 2002. Thus, the issue of paternity was certainly decided in multiple prior decisions and that issue is identical to, and decisive of, the issues in the current petition.
Although Mr. D. now alleges that he did not, at the time of those proceedings, have reason to believe that he might not be the father of this child, the testimony at trial showed otherwise. Mr. D. testified that he was warned before the child was born that he might not be the father. This was, obviously, before he signed the acknowledgment of paternity. It was a similar warning that prompted Mr. D. to obtain his own paternity test in September 2003. Even after receiving the first warning, Mr. D. chose to ignore the possibility that he was not the father, chose to hold himself out as this child’s father and chose to pass up numerous opportunities in a variety of court proceedings to litigate the issue. During all of that time, the child relied upon Mr. D.’s assertions that he was her father and formed a loving parent-child relationship with him. After listening to the testimony, I find that Mr. D. was on notice of the possibility that he might not be the father of this child prior to the child’s birth and long before the various support proceedings were instituted. He therefore had a full and fair opportunity to litigate this issue, and could have done so prior to the expiration of the 60-day period set forth in section 516-a.
As such, both elements of collateral estoppel are present and Mr. D. is foreclosed from reopening the issue of paternity at this time.
Equitable estoppel also bars Mr. D. from maintaining this proceeding. As stated above, the testimony at trial showed that he had established a significant relationship with this child. *787 Indeed, only a few months before the paternity test, he petitioned for and obtained joint custody. He exercised frequent visitation, including overnight visits on weekends and other visitation during the week as his schedule allowed. He also spent holidays with her, bought her gifts and took her on outings. Mr. D. himself testified that he had a “normal” father-daughter relationship with this child. Mr. D. held himself out as this child’s father despite having reason to believe, before her birth, that he might not be. There can be no question but that the child relied upon those representations.
Equitable estoppel only can be applied when it is in the child’s best interests to do so and here both Mr. D. and the Law Guardian argue that it would not be in the child’s best interest. The testimony at trial, however, did not support this conclusion. Dr. Anne Lockwood, a psychologist who evaluated the child, gave her testimony. Dr. Lockwood testified that the child was understandably upset and confused by the sudden disappearance of Mr. D. from her life but that she “was really moving along in the right direction.” Dr. Lockwood did express concern that a reintroduction of Mr. D. into the child’s life could potentially be harmful if he once again chose to suddenly absent himself. This possibility is, however, speculative. Dr. Lockwood also noted that there could be circumstances under which Mr. D. once again became a positive influence in the child’s life.
It is important to note that the question of whether or not it is in the child’s best interests to have contact with Mr. D. in the future is different from the question presented in this petition to vacate an acknowledgment of paternity. Any current concerns about harm to the child have already been addressed, since, in March of this year, Mr. D. consented to an award of sole custody to the child’s aunt and uncle and waived all rights to visitation or telephone contact. As Dr. Lockwood admitted, circumstances in the future might be very different. The child’s best interests do not, at this time, require a permanent termination of all possibility of a relationship with Mr. D.
At issue here is whether or not it is in the child’s best interests to preclude Mr. D. from challenging paternity. Other elements must be considered besides only the question of the possibility of future access. In Matter of Commissioner of Social Servs. of City of N.Y. v Jose M. (10 AD3d 498 [1st Dept 2004]), a similar situation occurred in which a man who had held himself out as the father of two children suddenly severed his relationship with them. The children were informed, then, that he was *788 not their father. The Court noted that the children were “devastated by his sudden withdrawal from their lives.” (Id. at 502.) Nevertheless, the putative father was equitably estopped from challenging paternity. The Court pointed out that the harm had largely been done and that genetic testing “would confer little benefit on either of the children.” (Id.) Any benefit to be gained by such testing “is not sufficient to overcome their loss of the ‘rights and status attached to legitimacy.’ ” (Id.) In the current case, “legitimacy,” as such, is not at issue, but rights to support and inheritance are.
Of course, some of the facts in the current case are different. Mr. D. was never married to the child’s mother, so there is no presumption of legitimacy in this case. The acknowledgment of paternity, however, serves much the same role. Also, Jose M. always knew that he was not the father of the children, while Mr. D. claims that he believed himself to be the father of this child. As discussed above, however, Mr. D. had reason to question his paternity even before the child was born, and nevertheless held himself out to be the father, even through extensive litigation. The child certainly relied upon his representations, and Mr. D. is the only father she has ever known. The trial established that there was a close relationship between them.
In another similar case, Matter of Barbara A. M. v Gerard J. M. (178 AD2d 412 [2d Dept 1991]), equitable estoppel was also applied to prevent a challenge to an order of filiation entered by consent. The father and mother, although once married, had another child after their divorce. The father admitted paternity in a support action and later sought a downward modification without challenging paternity. He later obtained a private DNA test which purported to find that he was not the boy’s father, and then moved to vacate the order of filiation. The child was 10 years old at the time of the motion. The Court relied upon the long-standing paternal relationship and the fact that the father freely supported the child. As in this case, the man was the only father the child had ever known.
This court takes very seriously the Law Guardian’s concerns about the potential negative effect Mr. D. could have on the child’s life if he reestablishes a relationship and then once more ends it abruptly. As stated above, however, that concern has been adequately addressed by Mr. D.’s voluntary surrender of custody and visitation rights. This child’s best interests are certainly better served by having a father with whom she has no contact than they Eire by having no father at all. Cutting off *789 her rights of support and inheritance, as well as giving an official “seal of approval” to Mr. D.’s conduct, would only allow Mr. D. to benefit from the very actions he took that harmed this child. Granting his petition would do nothing to address this child’s interests, but would only do her further harm.
For the reasons stated above, the petition is dismissed.
It is, therefore, ordered that the petition is dismissed in its entirety.